JOSEPH DEPUGH, Appellee, v. FRED BROWN, Appellant.

Mortgages: NEGLIGENCE IN EXECUTION: EVIDENCE. Where the evidence tended to show that a broker, in the sale of land to plaintiff, agreed to procure for him a loan at a specified rate of interest and to pay any excess rate; that he directed plaintiff to another who made the loan in two notes and mortgages, one bearing the agreed

rate and the other a higher rate, and that plaintiff did not read the notes and mortgages, but signed the same after the lender had read to him the mortgage bearing the lower rate. *Held,* that the question of whether plaintiff's negligence in signing the papers was such as to preclude his enforcement of the agreement with the broker was for the jury.

**Damages:** INSTRUCTION AS TO AMOUNT OF RECOVERY. Where there was no question as to the amount of plaintiff's recovery, and there was nothing for the jury to do in that regard except to make the computation, it was proper for the court to advise the jury of the amount, in case they found the plaintiff entitled to recover anything.

**Limitation of actions:** Where a broker agreed with the purchaser of land to procure a loan for him at a stated rate of interest and to pay any sum in excess of that rate, the statute of limitations would not commence to run against a claim for the excess until it was paid by the purchaser.

*Appeal from Harrison District Court.*—Hon. O. D. Wheeler, Judge.

Saturday, December 14, 1912.

Action to recover excess interest upon a loan which plaintiff was compelled to pay; defendant agreeing to pay all over 5 per cent. that plaintiff was compelled to pay. Defendant denied the allegations of the petition, pleaded the statute of limitations, and also, in substance, that plaintiff was not compelled to pay the amount of interest which he did, and that if he, plaintiff, had notified defendant, he, defendant, could have procured a loan for a much lower rate. On these issues the case was tried to a jury, resulting in a verdict and judgment for plaintiff, and defendant appeals.—*Affirmed.*

*C. W. Kellogg,* for appellant.

*S. H. Cochran,* for appellee.

DEEMER, J.—Defendant and one Ellis were real estate agents, and as agents for a landowner named Nelson they sold. his, Nelson's farm to plaintiff on or about March 1, 1906. It is agreed that plaintiff said he could not pay all cash for the farm, and would have to borrow some money thereon, and it is claimed by plaintiff that defendants then agreed that they would procure a loan for him at 5 per cent., and that, if he was obliged to pay more, they would pay him the difference.

Defendant denied that this was the nature of the contract, but the jury found against defendant on this proposition, and the verdict must in view of the conflict in the testimony be treated as a verity. Defendants deny that they agreed to furnish the money at 5 per cent., but stated that they could get a first mortgage at 5 per cent., and had made arrangements with one Burke at Missouri Valley for a second mortgage at 6 per cent. After the contract of sale had been signed, plaintiff went to Missouri Valley, and saw Burke, and on March 12, 1906, signed two mortgages securing two separate notes, one made payable to H. W. Binder and the other to Burke. The note to Binder bore 5 per cent., and the one to Burke 8 per cent. interest. Plaintiff signed the notes without reading, and did not know that the second bore 8 per cent. interest until some time afterwards, nor did he inform defendant of that fact until about a year afterward.

Plaintiff explains the circumstances attending the signing of the notes as follows:

At the time the two mortgages were made, the first one was read over to me by Mr. Burke. The second mortgage was not read over to me. . . . I discovered **1. MORTGAGES: negligence in execution: evidence.** for the first time that the second mortgage provided for 8 per cent. interest the year after it was made, when I went to pay the interest. At that time I went to see Mr. Brown, and I said to him that Mr. Burke said that that mortgage called for 8 per cent. Brown says: 'It is no such damn thing.' I told him that was what he charged against me, and I would not pay it. Mr. Brown said he would see about it. I spoke to Mr. Brown

again when I went to pay the interest again next year. I wanted him to straighten it out, but he didn't seem to think he would. I had to go off and leave it that way. * * * When I went to Missouri Valley, Billy Burke drew up the papers in his office. I went to Mr. Brown, and told him I was ready to close the deal. He says: 'Well. the papers are over to Mr. Burke's bank. We will have to go over there.' I do not recollect he said anything to Mr. Burke in my presence, but he told me, he says: 'I have got Mr. Burke to do this writing. He is a better hand than I am. I have got him to do this.' He said Mr. Burke would fix out the papers. Mr. Burke read the first mortgage from Mr. Binder. I knew I was giving the first mortgage to Mr. Binder. I did not say anything about the second mortgage, and he did not read it over, and he did not read over the note to me. I knew how much the second mortgage was, how much it called for, but I did not know what rate of interest. He told me how much the first mortgage was and read that over. I signed the second mortgage and the note with it without knowing what it was, except that it was a second mortgage for that amount. . . . At the time this mortgage (Exhibit 2) was signed, I went to Mr. Brown, and he said he got Mr. Burke to write it up, he was a better hand at the business. Mr. Brown went with me to the bank, and went through the bank to Mr. Withrow's office, and went out. He was not there when the papers were being signed. I did not see him about this again for a year. . . . I did not read the contract over. I can read a little. I can read newspapers sometimes. (Witness shown Exhibit 1.) Yes; I can see that signature on that contract. It is my signature. I can see the signature upon deed Exhibit 2. That is my signature. At the time this mortgage (Exhibit 2) was signed I did not get Mr. Burke to read it to me.

Burke testified as follows: "Mr. Brown called on me before this farm was sold in regard to securing this money for Mr. Depugh."

Defendant testified on the same subject as follows: "We told him (plaintiff) we could make the first loan at 5 per cent. straight and the second at 6 per cent. Said that Mr. Burke would make the second loan at 6 per cent. He said he

would take the farm if he could get it at $67.50 an acre and pay 5 per cent. on the first and 6 per cent. on the second loan. There was nothing said about how much of a first mortgage had to be made. He was to get all he could at 5 per cent. and the balance at 6 per cent.''

And Ellis testified: ''I told him we could get a first loan for all the farm would stand for 5 per cent. . . . We told him we could get all the farm could stand in the first mortgage at 5 per cent. It would be a higher rate for the balance. We did not know how much at that time. We saw him again that afternoon after we had been to town. We told Mr. Depugh at that time that Mr. Burke was to furnish the first loan at 5 per cent. and the balance at 6 per cent., but we did not know yet whether we could close the deal until we had seen Mr. Nelson as his price was still $70.'' Burke was recalled, and testified as follows: ''I have an independent recollection that I made out the mortgage, the body of it. It was signed in my presence as a witness. I do not now recollect how many days before the mortgage was drawn that Mr. Brown came to see me about it. Mr. Brown did see me about making the loan. He did not say anything about the per cent. at any time. At that time first mortgages could be had at 5 per cent.''

On this record the case was submitted with the results hitherto stated. Defendants contend (1) that there is no testimony to support the verdict; (2) that the court erred in giving and refusing certain instructions; and (3) that on the whole record there should be no recovery. The basis of all of these contentions is that plaintiff was guilty of such negligence in signing the mortgage without reading and in not attempting to get his money at a lower rate, or at least in not advising with defendant before signing the mortgage that he cannot recover. The trial court submitted the case to the jury for its determination of this question of negligence, instructing as follows:

(11)   The defendant Brown claims that, in executing said mortgage to W. J. Burke the plaintiff did not have the same read over to him, and did not read the same himself, and that the plaintiff was negligent in thus executing this mortgage without having the same read over to him or reading the same himself, and in not learning the rate of interest provided for therein.

(12)   'Negligence,' as that term is here used, means the 'want of ordinary care'; that is, the want of that degree of care and caution which an ordinarily prudent person would exercise when placed under like circumstances, in conducting a similar business or in doing like acts. It appears from the evidence without conflict that, when the plaintiff executed the mortgage to W. J. Burke, he did not read the same, or request that it should be read to him.

(13)   Ordinarily, where one is executing papers, like the mortgage in question, business prudence requires of him that he should either read the same or require the same to be read to him, so as to inform himself of its contents. And, where he fails to do this, he cannot be heard to complain that the instrument contains provisions to which he did not agree. He is presumed to have agreed to what is contained therein, and, unless some fraud or circumvention is practiced upon him to mislead and deceive him and prevent him from reading the instrument, he cannot be heard to complain that the instrument is different from what he believed it to be. And under the facts disclosed in the evidence in this case, unless the circumstances surrounding this transaction were such as to indicate to him and induce him to believe in the exercise of reasonable care and prudence upon his part, that the defendant Brown had looked after the matter and knew what the mortgage contained, then the plaintiff, in signing said mortgage, without reading the same, or requiring it to be read to him, was negligent, and such negligence, upon his part, would prevent his recovery in this case. Unless, therefore, it appears from the evidence before you that the representations made by the defendant Brown, if any were made by him, that the said Burke would furnish said money at 5 per cent., and the fact, if it be a fact, that the defendant Brown was at the office where the mortgage was executed, and directed that said Burke should draw the papers, were such circumstances as would have led a rea-

sonably prudent person to withhold from reading said mort-
gage or causing the same to be read to him, under like cir-
cumstances as those disclosed in the evidence before you,
before signing the same then the plaintiff was guilty of
negligence in signing such mortgage, without knowing the
contents thereof and such negligence would defeat his re-
covery in this action.   Whether the defendant Brown had
represented to plaintiff that said Burke had agreed to fur-
nish the money at 5 per cent., and whether or not defend-
ant Brown was present at the time said papers were drawn,
and whether or not the defendant Brown stated to plaintiff
that the said Burke would draw the papers, are questions
of fact to be decided by you from the evidence before you;
and, even if such facts be shown, it is also for you to say
whether or not such circumstances, if shown, were such as
would have led a person of ordinary care and prudence, un-
der such circumstances, to sign said mortgage, without read-
ing the same or causing the same to be read to him.

These instructions are complained of, and it is also con-
tended that the trial court erred in not giving the following
requests:

(3)   You are instructed that, if the plaintiff signed
the note and mortgage in question without reading them or
trying to inform himself as to the rate of interest the same
bore, his negligence in so signing same would preclude his
recovery herein.
(4)   Where a party signs a contract without reading
it, and the contract contains provisions different from the
agreement between the parties, the party signing without
reading is bound by such contract on account of his negli-
gence.

These present the opposing views of the parties, and
defendant contends that the trial court was in error in submit-
ting the question of negligence at all, and that, if this be not
true, it erred in its manner of submission because it referred
to matters not supported by the testimony.   We are of opinion
that the question of negligence on the part of plaintiff was

involved, and that there was testimony in support of all the matters referred to in the instructions. The case is peculiar, in that plaintiff went to the very man for his money to whom he was directed by defendant, and was led to understand that the rate of interest was agreed upon by defendant and Burke. Burke read him one of the mortgages, the one bearing 5 per cent. interest, and, as the other was not read, plaintiff might well have assumed that the second bore the same rate. The conduct of all of the parties was such as to put plaintiff off his guard, and a jury was justified in finding that he was not negligent. He was not under the circumstances required to notify defendant, for he went to the very man with whom he thought defendant had arranged for the money, and did not know that the second mortgage bore eight per cent. interest until some time after it was made. He had the right to assume that defendant's arrangements with Burke were being carried out. There was no error as we have said in submitting the question of plaintiff's negligence.

2. DAMAGES: instruction as to amount of recovery. The trial court fixed the amount of plaintiff's recovery in the event the jury found for him at 3 per cent. on the amount borrowed. In this there was no error. Plaintiff was entitled to that or nothing, and there was nothing for the jury to do in any event but to make the computation. There was no error then in the action of the trial court in doing it for them.

3. LIMITATION OF ACTIONS. The statute of limitations did not begin to run until plaintiff suffered some loss, and this was when he was compelled to pay the extra 3 per cent. This being true, the action is not barred. No prejudicial error appears, and the judgment must be, and it is, *Affirmed.*